Filed 12/15/23  P. v. Teague CA1/1
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL TEAGUE,<br><br>　　　Defendant and Appellant. | A162458<br><br>(Contra Costa County Super. Ct. No. 51821628) |

Defendant Samuel Teague was charged with one count each of forcible rape, assault with intent to commit a felony, injuring a spouse, assault by means likely to produce great bodily injury, and false imprisonment, along with several enhancements and special allegations.  A jury convicted him on all counts, and the trial court sentenced him to 50 years to life.

On appeal, defendant contends the trial court (1) erred in finding he waived his *Miranda*[1] rights and admitting statements he made to arresting officers; (2) abused its discretion in denying his motion for mistrial based on one juror's hesitation during polling; and (3) abused its discretion in declining to strike his prior felony and sentencing him under the "Three Strikes" law.

We affirm.

---

　　[1] *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

1

## BACKGROUND

Jane Doe and defendant began dating in 2011 and have one child together. She testified that over the years, she sometimes "did not feel safe around" defendant, such as when he once swung a clothing iron at her, almost hitting her in the head. On another occasion, defendant put Doe's head on the toilet and "smashed it between the toilet seat" and the toilet. When she was pregnant, defendant "threw hot coffee" at her. On other occasions, defendant slapped her. She never reported these incidents because she did not want "people knowing what I was going through."

In May 2018, Doe told defendant she wanted to end the relationship. Defendant did not "accept that," and he "wasn't ready to leave."

The following month, in June, Doe worked an early morning shift, which ended around 11:00 a.m., and then went to breakfast with some coworkers. She had "two or three Mimosas," left the restaurant around 1:00 p.m., and returned home. When she arrived, she went to sleep on the downstairs couch.

She awoke to defendant yelling at her. He was sitting on the stairs, with Doe's cell phone in his hands. He was going through her phone and saw that she had been communicating with a former romantic partner and the two had been "exchanging messages . . . or some kind of social media." Doe walked over to defendant and asked for her phone back. Defendant punched her in the face. It was like "[n]othing that [she'd] ever felt," and she fell to the floor. Defendant "kept punching" her, all the while calling her names "[l]ike bitch and ho and things."[2]

---

[2] Doe is 5'4" tall and weighs 170 pounds. Defendant is 6'1" or 6'2" and weighed "more than 250 pounds."

2

Doe was scared and eventually attempted to run to the front door. Before she could get out of the house, defendant pulled her by the shirt. He put his arm around her neck—so that her throat "would have been in the crook of his elbow or against his forearm"—and squeezed. Doe could not breathe, and she thought that she "was going to die." Defendant told her, "he did not care about my life" and "I don't care if you die." Doe lost consciousness. When she "came to" she was on the floor and defendant was straddling her and punching her with a closed fist. She noticed her pants were off. Defendant took off her underwear and removed her tampon. He told Doe, "he should rape me." All the while, he "kept hitting" Doe and kicking her in the head.

Defendant then put his hands around either side of Doe's neck and began "[p]ressing down." Doe "felt like I was being crushed," and she could not breathe. She thought she "was dying," and she lost consciousness again. Doe awoke naked, upstairs in bed. When she went to the bathroom and looked in the mirror, she could only open her eyes "a tiny bit." She did not look "like myself at all." Her face was swollen, her "eyes were shut," her "cheek was bleeding," and even her "ears were swollen." She "could barely walk," and everything on her body hurt.

She knew she "needed help," so she grabbed a towel and went to a neighbor's apartment. When the neighbor and her boyfriend opened the door and saw Doe, the neighbor "screamed" and the boyfriend exclaimed, "Oh, shit." The neighbor called 911. When police arrived, Doe had to be told she was speaking to an officer because her eyes were so swollen she could not see.

The officer asked what she had been hit with, and Doe replied "Fists." She also told the officer "[e]verything" hurts, when he asked "what part of your body hurts?" She was unsure how long "defendant had been beating"

her, but told the officer, it felt like hours, "it felt like, I was being tortured," and that defendant had "choked" her until she lost consciousness. The officer did not ask if she had been sexually assaulted or whether she had sex with defendant. Doe was then taken to the hospital. Prior to that night Doe had not had "consensual sex" with defendant for two or three weeks.

The Contra Costa County District Attorney filed a five-count information alleging one count of forcible rape (Pen. Code, § 261, subd. (a)(2)—count 1)[3]; assault with intent to commit a felony (§ 220, subd. (a)(1)—count 2); injuring a spouse (§ 273.5, subd. (a)—count 3); assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)—count 4); false imprisonment by violence (§§ 236, 237—count 5). As to each count, the information also alleged an enhancement of infliction of great bodily injury involving domestic violence (§ 12022.7, subd. (e)), and as to counts 1 and 2, an enhancement of great bodily injury during a sex offense (§ 12022.8). As to count 1 there was an additional allegation of infliction of great bodily injury (§ 667.61, subds. (a), (d)). Finally, the information alleged a prior serious or violent felony for attempted robbery with a firearm. (§§ 667.5, subds. (a) & (b).)

At trial, in addition to Doe, the neighbor testified. Doe had previously told her the relationship with defendant "was finished." On the morning of the incident, she awoke to the sound of someone "scratching or knocking at the door." When her partner opened the door, he said, "Oh my, God." She saw that Doe's "eyes were completely shut." Had she "not said her name," she would not "have known who it was." Doe was dressed only in a towel and

---

[3] All further statutory references are to the Penal Code unless otherwise indicated.

4

said defendant "beat her up." The neighbor brought her in, called 911, and got Doe a T-shirt.

Dr. Jeanne Pae, an emergency medical physician, testified that she treated Doe on the morning of June 9. Doe had "[s]ignificant diffuse facial swelling ecchymosis, bilateral paraorbital [*sic*] ecchymosis and edema,[4] one centimeter laceration to the left cheek, swelling to the upper and lower lips, V shaped laceration to the upper lip, right side." CAT and CT scans showed Doe had a "large amount of swelling and bruising to the right side of the neck," an "[a]cute left medial orbital wall blowout fracture," meaning the bones surrounding her left eye and closest to her nose were broken, and there was bleeding "inside the skull" in "the brain matter" on her right side. Doe had bruising over the "right part of the abdomen," on her right shoulder, left arm, and elbow. She had contusions and scraping on right knee and left tibia. Doe's injuries were "[p]ossibly" "consistent with a person being strangled."

Pittsburg Police Officer Colton Harvey testified he responded to the scene at Doe's apartment complex around 5:00 a.m. He went inside the neighbor's apartment, where he found Doe sitting on the couch. "It was immediately evident that she had significant blunt force for trauma to her face." He noticed both of Doe's "eyes were swollen shut, significant bruising, lumps. She was bleeding from one of her eyes." Doe appeared as if she "had a lot of difficulty talking and articulating some of the events that had transpired. It took a while to kind of get the information out."

During this initial interview, Doe told Officer Harvey that "[t]hroughout the physical altercation that occurred, she did lose

---

        4 Ecchymosis means bruising, periorbital means "around the eye," and edema means swelling.

consciousness." Doe described being choked "about four times." Officer Harvey called for a "Code 3" medical assistance, which means "emergency response, lights, sirens, it requires 'we need you now.'" He only talked to Doe for about 10 minutes to "develop what happened" and to get "the basics, all the barebones information" of "how did she sustain these injuries, who was the responsible person."

Officer Harvey next spoke to Doe two hours later in the emergency room, around 7:18 in the morning. Doe appeared to be in pain and "had difficulties articulating sequence of events and kind of had some time-lapse issues which is very common with people that sustain traumatic injuries."

Doe said she and defendant had dated for about six years, lived together, and had one child together but were "in the middle of breaking up." On the day of the incident, defendant had seen text messages on Doe's phone "regarding another male." Defendant then "hit her extremely hard in the face" with a closed fist, which caused her to fall to the floor. Defendant then got on top of her and began punching and kicking her. Doe stated she was too "scared to fight back." She "tried to get up and run away" but defendant "grabbed her by the throat" and "choked her." He "choked her about four times" and she lost consciousness twice. Defendant told her, "I don't care if you die." During conversation, Officer Harvey again questioned Doe about "how she was hurt" and "who hurt her" but did not ask "about whether she had had sex with somebody."

When Officer Harvey spoke with Doe about 15 minutes later, he had received some information from Officer Miguel Gutierrez "that there was potentially sexual intercourse or something like that between Jane Doe and [defendant]." So, Harvey "questioned her regarding the sexual intercourse between her" and defendant. Harvey asked Doe if the two had had "sexual

6

intercourse before you guys got in a fight?" Doe responded, " 'No, he tried to rape me.' "

Pittsburg Police Detective Miguel Gutierrez[5] testified he arrived at Doe's apartment complex shortly before Officer Harvey. While Officer Harvey went to check on Doe at the neighbor's apartment, Officer Gutierrez went into Doe's apartment. He described the living room as being "in disarray. There was things moved around. The couch was moved around. It looked like a struggle or a fight or something had occurred in that living room." He also noticed "a little bit of blood on the couch as well as on the clothes around there." Later, "a tampon" was found "near the couch." Leaving the living room, he saw "other spots of blood in the beginning couple steps of the first tier of the stairs to go to the second floor." Gutierrez also saw "a little bit of blood on the toilet" in the bathroom on the second floor. He also found defendant on the second floor, "laying on the bed there" asleep. Defendant was "completely naked" with a blanket over him. There was blood on the bedroom wall, the bed as well as on the pillow on which defendant was lying. Gutierrez took defendant into custody and read him his *Miranda* rights.

Officer Gutierrez spoke to defendant twice, once at 6:20 a.m., and the second time at 8:47 a.m.

During the 6:20 a.m. interrogation, defendant stated he had gone to Doe's apartment at 11:00 p.m. the night before. When he arrived, Doe was already there, and the two "fucked." They "had an argument after that." When Officer Gutierrez asked him to "explain why there was blood all over

---

[5] We note Officer Gutierrez's name is "Gutierrez" throughout the record on appeal, however, in the transcript for the trial it is spelled "Gutuirrez." We use the more common spelling, and accordingly refer to him as Officer Gutierrez.

the house," defendant "had no explanation to it." He said, " 'I don't know. You would have to ask her.' " He also said Doe "seemed fine" when they went to sleep" and that "he was holding her." When Gutierrez "pointed out to him that it was a little weird that there was blood all over the house," defendant said he did know how Doe got hurt. Defendant explained he "was drunk" but he later said he "wasn't even buzzing." He then admitted " 'We had a fight, bro. I did all that shit to her. I fucked up.' " When asked if he caused the injuries to Doe, defendant stated, "Yeah, I did it, bro." Defendant said, "I'm not going to lie about it, bro, because I knew this was going to happen. I knew I was going to go to jail after what happened and shit. Shit just got too out of hand. I did too much so I deserve everything I got coming. I ain't trippin'. I'll tell everything I did. I fucked up so I take full responsibility for all the shit, bro. I really do. It's on me in a heartbeat." Defendant told Gutierrez Doe "was throwing up," and she "had trouble walking so he would assist her" to the bathroom, both of which "he attributed . . . to alcohol." He said Doe vomited four times.

Over the course of the interview, defendant went back and forth, sometimes denying he did things or saying he could not remember. Defendant denied choking Doe but admitted hitting her. When Officer Gutierrez asked defendant how Doe was, "[a]fter you beat her up?" defendant said she wanted to go to the hospital. But defendant also said he and Doe "had sex throughout the night." When Gutierrez asked how Doe went from wanting to go to the hospital to having sex all night, defendant "didn't have a good explanation." Defendant simply said, "We would just sit. We was just fucking." Defendant insisted he did not rape or force himself on Doe, and she did not pass out. Doe "encouraged him to have sex with her." When Gutierrez asked defendant, "why she was going along with the sex and if she

8

wanted to," defendant said, " 'No. I guess cause she probably was just, like, tired of fighting with me.' "

During the second interrogation, defendant told Officer Gutierrez that he and Doe had "makeup sex." He again said Doe "was so drunk she couldn't walk," telling Gutierrez "I picked her up, though. I helped her move and stuff because she couldn't walk and shit. So I picked her up and maneuvered her because she wasn't like walking and shit because she was fucking hella drunk." He said he "had been trying to clean her up." He also acknowledged Doe "had been trying to get away from him." When Gutierrez asked defendant, why she would do that, defendant responded "he believed it was because he was hitting her." Defendant continued, "I know she was trying to, like, stop me from hitting her and stuff." When she would try to get away, defendant would try "to fight her."

Contra Costa County Senior Inspector Kay Belk testified she spoke with Doe about three months after the incident. Doe related that after her overnight shift at work, she and a coworker went to breakfast, and then she went home. Once there, she fell asleep on the couch. She was awakened by defendant. He had "her phone on the stairs and he was saying that she was a bitch and a whore." While she was still in the living room, defendant punched her in the face, with a closed fist, "with such force that she fell backwards." After he punched her, Doe attempted to get away, but defendant "used a choke hold to drag her back towards the couch." Doe "felt a lot of pressure on her throat." Doe attempted to leave out of the front door, but defendant grabbed her shirt and choked her. She felt his "thumbs being pressed forcibly on her throat and neck with a crushing sensation," and she had difficulty breathing. Doe thought "she was going to die." She remembered "waking up upstairs in her master bedroom" naked. She had

9

"no memory of who took her clothes off." She had been on her period on the day of the incident and had "no recollection of how the tampon was removed even though she did remember . . . having a tampon on earlier that day." She could not remember having sex with defendant. When Belk asked Doe if she had willingly had sex with defendant, she said, "No."

Doe did not know the time but remembered it "was getting dark outside." She could not remember if defendant was in the bedroom. She looked at herself in the mirror and her face was "deformed, her eyes were swollen shut." Her first instinct was "to find a safe place and get some medical attention." Doe wrapped a towel around herself and went to her neighbor's apartment and "told them [defendant] had beat her up."

Defendant also testified. He said he had been out watching a basketball game on the night of the incident. He had "been drinking a little bit" and was "feeling the effects of the alcohol." When he returned to Doe's apartment, he saw her asleep on the couch, dressed in her work uniform. He woke her up and she was "groggy and sleepy." After they talked, the two had sex in the living room. After they had sex, defendant went to the bathroom. When he returned, he saw Doe looking through his phone. Defendant thought she "was jealous" and had a "suspicion I might have been talking to other people." He started looking through Doe's phone, and saw "text messages from her and another guy." He "felt like the world just dropped on my head," and he "got really angry, really angry." "I probably never been that way before. Extremely angry." When Doe moved toward him, he "punched her really hard" in her face, and she fell to the ground. He "continued to hit her in her face," with a "closed fist." It "was a barrage. It was a lot of punches." He "felt really betrayed." Doe "tried to run through the front door," but he "caught her," "put my arm around her neck," and

"continued to assault her." He "dragged her to the ground," "got back on top of her," and "kept hitting her." He choked her because he "was mad. I was feeling betrayed." She lost consciousness.

After Doe "passed out," he carried her upstairs in a "stand-up position," kind of "pulling her up the stairs." Doe had a "cut under her" left eye and her "lip was a little bit, like, busted." Doe "looked like somebody hit her." There was the cut and "a little puffiness on her bottom lip" but her face was not swollen up "at all." He took her to the bathroom, "[b]ecause there was blood all over her face." So he tried "to clean it up" because there was "just a lot of blood coming from her eye." At that point, Doe woke up. "[B]lood was just everywhere," and her eye continued to bleed. They were both naked, and they walked to the bedroom. He went and plugged in her phone because it "was dead," and he "wanted to look through it some more." After he read more messages, he "got extremely mad again" and "reached over" and "slapped her hard." Doe "fell backwards," and defendant "grabbed her arms, and I spit in her face" because he "felt betrayed. I was really, really mad." He was "calling her names and stuff," and he "wasn't thinking."

After he "stopped spitting on her," Doe "sat up on the bed, and she kind of started throwing up." Defendant "thought she was drunk." He also thought "the way her eye was bleeding. There was so much, like, blood, I thought it was, like, thin. Because I know that—I heard that when people are drinking that their blood gets thin." Defendant put Doe back in the bathtub because she "was bleeding" and wiped her face and upper body with a towel, "wherever there was blood on her body." Once he "started taking more care of her," his anger "started subsiding." Defendant got Doe some water, and they had a "heart-to-heart conversation" about their relationship. He said Doe apologized "for lying," and she told him "she just wanted to be

11

happy and things like that." She rubbed his shoulders, and he held her. Defendant "was feeling kind of vulnerable," and he began "kissing on her" which "led to us having sex." After they "had sex a lot," they "eventually went to sleep." He awoke to the police.

Defendant said Doe wanted to go the hospital but he did not take her because he "was scared." He said her injuries were just "a cut on her eye, and like, a swollen lip." He had planned to take Doe to the hospital the next morning. He did not think what he did to Doe "was right" and he felt "[e]xtremely bad" about it.

He denied raping Doe, pulling down her pants, taking out her tampon, or threatening to rape her. He maintained they had consensual sex that night. He denied ever hitting Doe before, but acknowledged they had arguments. He said he never threw coffee "at her or anything like that"— they had argued "and I had the coffee in my hand and some of my body movements made some of the coffee come out of the cup and get on her." Nor, said defendant, did he ever threaten her with an iron—while they were arguing, defendant "turned around to leave and the iron was on . . . the dresser, and I just hit it . . . as I was going out." He denied ever putting her head on the toilet.

On cross-examination, defendant admitted he told Officer Gutierrez that the "beating, had really escalated upstairs." But defendant then stated, "I think I just was over exaggerating right there. I didn't mean it escalated like that." He admittedly told Gutierrez Doe tried to get away "several times" while upstairs and she had "vomited there next to the bed a few times." He also said when he "slapped her," she "kind of backed up from me" because "she didn't want to get hit." But then he spit in her face because he "was hella mad." He admitted he never told Gutierrez that Doe began "touching"

12

and "caressing" him, but that was because he never asked. He told Gutierrez he had not taken Doe to the hospital, not because he was scared but because they could not find her phone and he thought both of their cell phones were out of battery.

The jury found defendant guilty on all charges and found true all enhancements, and the trial court sentenced him to 50 years to life.

DISCUSSION

### Motion to Exclude Statements to Officer

Defendant made a pretrial motion to exclude his statements to Officer Gutierrez on the ground he had not waived his *Miranda* rights.

The trial court held an Evidence Code section 402 hearing at which Officer Gutierrez testified as follows: After he and defendant arrived at the Pittsburg Police Department for booking, he read defendant "an admonishment of [his *Miranda*] rights." Gutierrez read from a printed card, with his body cam turned on. He read the rights, "quickly" and "clearly." When he asked defendant if he understood his rights, defendant "nodded implying that he understood the questions." Defendant nodded, "[u]p and down." The form from which Gutierrez read blocked the bodycam's view of defendant's head, so the video does not show defendant nodding his head. Gutierrez did not provide a copy of the form to defendant, nor did he have defendant sign it.

On cross-examination, Officer Gutierrez acknowledged that in his written report he wrote defendant "stated he understood his *Miranda* rights." Defense counsel asked, "So when you wrote your report, it would indicate that [defendant] said 'yes,' is that correct that he understood his rights?" Gutierrez answered, "No. When they give me a verbal confirmation of 'yes' or

13

'yeah,' I'll notate and quote them; but that's not what he did here." Gutierrez acknowledged he did not make a written note that defendant "nodded."

After argument by counsel, the trial court ruled from the bench and denied the motion to exclude. The court explained, "I have reviewed my notes and read the cases that you've provided and reread the defense's brief. And looking at the totality of circumstances, the defendant did—I wanted to mention, the defendant did nod his head several times on the video,[6] as well as the officer saying that he nodded his head to say yes when they did the waiver of the *Miranda* rights. The Court does find Officer Gutierrez to be credible when he said the defendant nodded his head. There is no coercion in this case. The defendant voluntarily told his side of the story and what happened. The defendant did not ask any questions after being read his *Miranda* rights. There is no requirement that an in-custody accused expressly waive his right to counsel in silence after being advised of those rights. [¶] . . . [I]f the totality of the circumstances surrounding the interrogation reveals an uncoerced choice and the requisite level of comprehension, the court may conclude the *Miranda* rights have been waived. The U.S. Supreme Court has repeatedly explained that, if a suspect makes a non-coerced decision to speak with authorities with knowledge of the right to remain mute and to counsel, the ensuing statement is admissible as a matter of law. The Court finds that the statements of the defendant were not the product of a deceptive scheme designed to undermine the holdings of *Miranda*; and therefore, the statements are admissible in the prosecution's case-in-chief."

---

[6] The court was presumably referring to the interview video, as it shows defendant nodding his head up and down a number of times to indicate affirmative responses.

14

*Miranda* serves as a "procedural safeguard[]" to protect the privilege against self-incrimination and requires that prior to any "custodial interrogation" a suspect "must be warned that he has a right to remain silent, that any statement he does make may be used against him, and that he has a right to the presence of an attorney, either retained or appointed." (*Miranda, supra*, 384 U.S. at p. 444.) For purposes of *Miranda*, " 'interrogation' " means "express questioning" or "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response." (*Rhode Island v. Innis* (1980) 446 U.S. 291, 300–301.) "After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him." (*Miranda*, at p. 479.)

"It is well settled that law enforcement officers are not required to obtain an express waiver of a suspect's *Miranda* rights prior to a custodial interview and that a valid waiver of such rights may be implied from the defendant's words and actions." (*People v. Parker* (2017) 2 Cal.5th 1184, 1216 (*Parker*); *Berghuis v. Thompkins* (2010) 560 U.S. 370, 384 ["a waiver of *Miranda* rights may be implied"].) "If the State establishes that a *Miranda* warning was given and the accused made an uncoerced statement, this showing, standing alone, is insufficient to demonstrate 'a valid waiver' of *Miranda* rights. [Citation.] The prosecution must make the additional showing that the accused understood these rights. [Citations.] Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." (*Berghuis,* at p. 384.)

15

"Although there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was knowing and intelligent under the totality of the circumstances surrounding the interrogation." (*People v. Cruz* (2008) 44 Cal.4th 636, 668.)

Our standard of review of a trial court's *Miranda* ruling is well-established. " '[W]e accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from the undisputed facts and the facts properly found by the trial court whether the challenged statement was illegally obtained.' " (*People v. Flores* (2020) 9 Cal.5th 371, 418.)

Officer Gutierrez's testimony provided sufficient support for the trial court's findings of fact and its conclusion that, given the totality of the circumstances surrounding the interrogation, defendant knowingly and intelligently waived his rights. There is no question Gutierrez read defendant his rights, and defendant has never claimed he did not understand English, the language used by Gutierrez. It is also undisputed Gutierrez asked defendant if he understood his rights, as that is recorded on the bodycam video. At that time, Gutierrez was holding the advisement card in front of him, blocking the bodycam's view of defendant's head. However, Gutierrez testified defendant nodded his head "up and down," and trial court found Gutierrez's testimony credible. Gutierrez's testimony that defendant responded by nodding was also corroborated by the fact defendant routinely nodded his head up and down to indicate "yes" during the two subsequent interviews as shown by interrogation videotape. It is also undisputed that after Gutierrez read defendant his rights, defendant readily answered Gutierrez's questions and provided long and detailed answers. Defendant

16

never expressed any desire to stop talking or made any request for counsel. Nor was there any evidence defendant was under any kind of distress. In sum, the record amply supports the conclusion that defendant impliedly waived his *Miranda* rights.

Defendant maintains Officer Gutierrez's testimony that defendant nodded his head up and down, indicating agreement that he understood his rights, was not credible because of the "manner in which Gutierrez read the *Miranda* admonitions." Specifically, defendant claims Gutierrez "mechanically raced through" the recitation without ever pausing to ask if defendant understood those rights, "chose not to read the 'waiver' portion of the admonitions form,"[7] "never let [defendant] himself read the form," and did not have defendant initial or sign the form.

While it is accurate to describe Officer Gutierrez as "quickly" reading the admonishment of rights, he did so clearly as the bodycam video shows. Defendant cites no authority stating Officer Gutierrez was required to do anything other than what he did. And as we have recited, nothing in the record suggests defendant did not understand Gutierrez's admonishment.

---

[7] The admonishment form had two parts. Officer Gutierrez read from Part A as follows: "So, gotta read these rights here. You have the right to remain silent. You don't have to answer my questions or talk to me. Anything you say can and will be used against you in a court of law. You have a right to talk to a lawyer or have them present while you're being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish. You can decide at any time to exercise these rights and not answer any of my questions or may any statements. Do you understand?"

Part B, from which Gutierrez did not read, stated: "After the warning, and in order to secure a waiver, the following questions should be asked and an affirmative reply secured to each question." Question One asks, "Do you understand each of these rights I have explained to you?" Question Two asks, "Having these rights in mind, do you wish to talk to me now?"

17

Defendant was 35 years old, he spoke English, and he was able to communicate readily with Gutierrez during the interviews. He did not indicate in any way that he did not understand what Gutierrez read to him. He also had had prior experience in the criminal justice system, having previously been convicted of a serious or violent felony. (See *Parker, supra,* 2 Cal.5th at p. 1216 [" '[T]he question of waiver [of *Miranda* rights] must be determined on "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." ' "], quoting *North Carolina v. Butler* (1979) 441 U.S. 369, 374–375.)

Defendant also points out that in his report Officer Gutierrez wrote that defendant "stated he understood his *Miranda* rights." On cross-examination during the Evidence Code section 402 hearing, Gutierrez explained this did not mean defendant verbally confirmed he understood. "When they give me a verbal confirmation of 'yes' or 'yeah,' I'll notate and quote them; but that's not what he did here." Defendant also points out that at the preliminary hearing—to which defense counsel referred while cross-examining Gutierrez during the Evidence Code section 402 hearing—defense counsel asked Gutierrez, "And after you read Mr. Teague his *Miranda* rights, did he reply to you in any manner if he was waiving those rights?" and Gutierrez answered, "I do not recall." However, on redirect during the preliminary hearing, the prosecutor clarified, "When you read Mr. Teague his rights, did he indicate to you that he understood them?" Gutierrez replied, "From what I recall, yes."

In any case, defendant's challenge to Officer Gutierrez's credibility is misdirected. That was a matter committed to the trial court and is not an issue that can be revisited on appeal. (See *People v. Gerson* (2022) 80 Cal.App.5th 1067, 1079–1080 [" ' "We do not reweigh evidence or

reevaluate a witness's credibility." [Citations.] "Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support [a trial court's factual finding." ' "], quoting *People v. Brown* (2014) 59 Cal.4th 86, 106.)

## *Jury Verdict*

Defendant contends the trial court "committed reversible error by failing to clarify a polled juror's equivocal response" and also erred in denying his motion for mistrial. (Capitalization omitted.)

During deliberations, the jury sent a note to the court that it could not "come to agreement on the greater of count 1 [and] 2, what should we do?" The trial court wrote back to the jury that it would declare a "mistrial on those counts" and asked whether they had reached a verdict on counts 3, 4 and 5. Less than two hours later, the jury notified the court it had reached a verdict on all counts and requested a break. The court recessed for the day and called the case the next morning.

The following morning, the verdict was read finding defendant guilty of forcible rape (count 1), assault with intent to commit rape (count 2), injury to a person with a dating relationship (count 3), assault by means likely to produce great bodily injury (count 4), and false imprisonment (count 5). The jury also found true that defendant personally inflicted great bodily injury during a sex offense as to counts 1 and 2, that he inflicted great bodily injury

19

as to count 1, and that he personally inflicted great bodily injury under circumstances involving domestic violence as to all of the counts.

The court asked the jury if the "verdicts" were their "true and correct verdicts," and the jurors responded, "Yes." Defense counsel requested the jurors be polled as to counts 1 and 2.

Beginning with count 1, the court asked each juror, "Is the verdict as I just read as to Count One your true and correct verdict?" Juror No. 7 responded, "Is there an option?" The court replied, "It's a yes or no question." Juror No. 7 responded, "Yes." The court and counsel then held an unreported sidebar. On concluding the sidebar, the court resumed polling. Following that, the verdicts were recorded, and the jury excused.

Defense counsel asked to "make a record" and the following exchange occurred:

Defense counsel: "I do object to the jury verdicts being recorded. I'm not convinced that Juror No. 7 gave her verdict, when asked as to Count One, she paused for quite a long time and seemed to be quivering on the verge of tears. She seemed very emotional. She did not seem to be—that did not seem to be her true and correct verdict. And she asked, Do I have an option? What I'm very concerned about is the jury came back yesterday saying they were hung on Counts 1 and 2 and then came back later on saying, We have verdicts. I do object. I do object that verdicts are recorded in this case. I think it should be a mistrial on Counts One and Two, and I would so request that being done. And I believe going forward at this point would be a violation of my client's constitutional rights under both the State and Federal Constitutions for a fair trial and due process of law and equal

20

protection. So we would request that Counts One and Two be declared a mistrial.

"[The Court]: Okay. That motion is denied. And I did indicate to both counsel at the bench that it would be denied.

[¶] . . . [¶]

"[The prosecution]: . . . Can I just make a statement regarding Juror No. 7 very quickly.

"The Court]: Absolutely.

"[The prosecution]: I'd just like to clarify or reiterate that when she asked, Is there an option? And the Court clarified that the question is a 'yes' or 'no' answer, she immediately responded 'yes.' That was unequivocal. There was no pause or hesitation at that point. And, also, when she was asked regarding Count Two, she immediately responded 'yes', no hesitation and she seemed to not have any issues there. I agree with the Court. I would ask that the motion be overruled.

"[The Court]: And she also did on the GBI clauses, too.

"[The prosecutor]: Correct.

"[Defense counsel]: And I would beg to differ that her reaction was immediate. There was quivering in her voice. She seemed very unsure. She seemed that that was not what she did wanted [*sic*] to do. She appeared under pressure to me from the way I saw it. And I do not agree that when she answered 'yes' to Count One that that was unequivocal and was immediate.

"[The Court]: Okay."

"Every criminal defendant is entitled to a unanimous jury verdict."
(*Chipman v. Superior Court* (1982) 131 Cal.App.3d 263, 266 (*Chipman*); see Cal. Const., art. I, § 16; *People v. Collins* (1976) 17 Cal.3d 687, 693 (*Collins*)

21

superseded by statute on another ground as stated in *People v. Boyette* (2002) 29 Cal.4th 381, 462, fn. 19.)  To safeguard this fundamental right, the Legislature has set forth procedures the trial courts "must follow in receiving a jury verdict." (*People v. Carbajal* (2013) 56 Cal.4th 521, 530.)  Section 1147 provides, "When the jury have agreed upon their verdict, they must be conducted into the court by the officer having them in charge."  Section 1149 provides, "When the jury appear they must be asked by the court, or clerk, whether they have agreed upon their verdict, and if the foreman answers in the affirmative, they must, on being required, declare the same." Section 1163 provides, "When a verdict is rendered, and before it is recorded, the jury may be polled, at the request of either party, in which case they must be severally asked whether it is their verdict, and if any one answer in the negative, the jury must be sent out for further deliberation."

However, "not every expression of uncertainty during polling requires that recordation of the verdict be withheld while the jury is sent back for further deliberations."  (*Chipman, supra*, 131 Cal.App.3d at p. 267.)

We review a trial court's ruling on a motion for mistrial for abuse of discretion.  (*People v. Bell* (2019) 7 Cal.5th 70, 121 [" 'We review a ruling on a mistrial motion for an abuse of discretion.  [Citations.]  A trial court should declare a mistrial only " 'if the court is apprised of prejudice that it judges incurable by admonition or instruction.' " [Citation.]  "In making this assessment of incurable prejudice, a trial court has considerable discretion." ' "].)

Given the record here, the trial court did not abuse its discretion in accepting the juror's verdict and denying defendant's motion for a mistrial. The juror's hesitation as to count 1 was momentary, and after the trial court answered her question, her response was immediate, as were her responses

on count 2 and the attendant enhancement allegations.  (See *People v. Burnett* (1962) 204 Cal.App.2d 453, 457–458 [no error where juror responded, " 'How do you do that when you are in doubt?  I guess you say "Yes," ' " but subsequently responded, " 'Yes' " when asked by the court, " 'Well, it is my verdict' " because " 'although a juror at first answers evasively or in the negative, if he finally acquiesces in the verdict, it must be sustained' "].)

Defendant cites to *People v. Superior Court* (1967) 67 Cal.2d 929.  In that case, one juror stated during polling, "I don't know how to tell you this.  Should I tell you or—."  The trial court asked again, "Is that your verdict?"  The juror responded, "I didn't vote on it, your Honor."  (*Id.* at pp. 930–931.)  After continued questioning, the juror stated he "went along with the majority."  When the court asked, "Does this verdict express your individual opinion?"  The juror responded, "It does, sir.  It does, sir."  The court then asked, "What is your individual opinion?"  The juror responded, "I went along with the majority of the jury."  (*Id.* at p. 931.)  The court declared a mistrial, and the People petitioned for a writ of mandate.  (*Id.* at pp. 930–931.)

The Supreme Court held the trial court acted within its discretion in declaring a mistrial.  (*People v. Superior Court, supra,* 67 Cal.2d at pp. 932–933.)  The high court explained, "Where, as here, a juror makes equivocal or conflicting statements as to whether he has assented to the verdict freely and voluntarily, a direct question of fact within the determination of the trial judge is presented.  The trial judge has the opportunity to observe the subtle factors of demeanor and tone of voice which mark the distinction between acquiescence and evasion of individual choice.  The trial judge can determine whether returning the jury for further deliberation is likely to secure a real verdict, or whether the juror has really disagreed so that the verdict is not unanimous and not likely to become so."  (*Id.* at pp. 932–933.)

23

The circumstances in the instant case are profoundly different. To begin with, the issue here is whether the trial court abused its discretion in *denying* a motion for mistrial. Furthermore, the exchange between the court and Juror No. 7 was markedly different from the exchange in *People v. Superior Court.*

Defendant's reliance on *People v. Pickett* (N.Y. 1983) 92 A.D.2d 843 (*Pickett*) is likewise misplaced. In that case, when the trial court asked a juror, " 'Mary White, are those your verdicts?' " She responded, " 'Yes, under duress. . . .' " (*Id.* at p. 843.) The court asked again, " 'Are they your verdicts, yes or no?' " At that point, the juror responded, " 'Yes,' " and after polling was complete the verdict was entered. (*Ibid.*) After an off-the-record discussion, defense counsel stated on the record that he had requested that the court hold a hearing or question the juror further to "make a determination as to what the duress consisted of." (*Ibid.*) The court stated, in turn, "the jurors had been instructed at the *voir dire*, in summations and in the charge, of their duty to deliberate and exchange views and to adhere to their views after believing they are right, and after discussion with the other jurors. Accordingly, the court said he found no basis to conduct any hearing or make any further inquiry." (*Ibid.*) The appellate court reversed, stating, the trial court "should have done something to satisfy himself that the verdict was the individual voluntary verdict of that juror." The court could have exercised its discretion to order the jurors to resume deliberation, or "alternatively, in the exercise of discretion, the Judge might have exercised his discretion to the extent of giving the juror an opportunity to elucidate briefly what she meant by . . . 'under duress,' " which at the very least carried "the connotation that the verdict is not voluntary and unforced by circumstances unrelated to the merits." (*Id.* at pp. 843–844.)

The facts here are, again, not comparable.  Juror No. 7 did not suggest in any way that her verdict had been coerced.[8]

 _____

 [8] Defendant devotes 13 pages of his opening brief to citing other federal and out-of-state cases.   All are factually distinguishable, and none compel the conclusion the trial court abused its discretion in this case. (E.g., *United States v. Banks* (2020) 982 F.3d 1098, 1101–1102 [risk of juror coercion was clear and obvious where, among other things, juror initially responded she was " 'Forced into' " her verdict when polled and repeated inquires by court yielded further equivocal answers such as " 'I suppose so,' " " 'I don't know how to answer that,' " and " 'I feel like I need more time' "]; *United States v. Morris* (1979) 612 F.2d 483, 489 [uncertainty about the verdicts created where juror "first voted guilty as to [one defendant] in the jury room and then changed that vote to not guilty by the time of the polling"]; *United States v. Edwards* (1972) 469 F.2d 1362, 1366–1367 [trial court committed reversible error in accepting verdict after juror responded during polling, " 'It's my verdict, but I'm still in doubt,' " and the trial court only clarified, " 'The juror stated that this is her verdict.  Is that what you said?' " because at no time did the juror "state unequivocally that she concurred in the verdict"]; *People v. Ramunni* (N.Y. 2022) 203 A.D.3d 1076, 1079 [trial court committed reversible error when accepting verdict, when juror responded during polling verdicts, " 'Um, I'm not sure, with some, but most of them yes,' " and the court's subsequent inquiry was insufficient, where trial court inquired whether verdict was her own by asking " 'is that a yes or a no' in the presence of the remaining jurors" since juror "may have succumbed to pressure to vote with the majority even though she did not agree with the verdict as to certain counts"]; *People v. Mercado* (N.Y.Ct.App. 1998) 695 N.E.2d 711, 712 [the defendant's contention—that the trial court erred in failing to make certain inquires when, during polling, juror initially and "a number of times" afterwards failed to answer whether the verdict was hers—was forfeited because he failed to make specific objection at the time]; *Lattisaw v. State* (M.D. 1993) 619 A.2d. 548, 549, 552 [trial court committed reversible error in concluding juror's verdict was unambiguous where, without further attempt to clarify and without sending jury back for further deliberations, juror responded, " 'Yes, with reluctance,' " when asked whether her individual verdict was the same as the jury's verdict]; see *People v. Superior Court, supra*, 67 Cal.2d at p. 933, fn. 4 ["Both parties rely upon decisions from other jurisdictions.  They are not helpful.  Many of them may be reconciled on the theory that the appellate court was merely upholding a trial court determination when the juror's responses were equivocal or conflicting.  A

25

**Romero *Motion*[9]**

Defendant contends the trial court abused its discretion in sentencing him to 50 years to life. Specifically, he claims the trial court should have exercised its discretion to "disregard a prior strike in the interest of justice."

After hearing from counsel as to whether the court should strike defendant's prior strike and whether defendant fell within the "spirit" of the Three Strikes law, the court declined to strike the prior. The court explained, "I do believe the defendant falls within the spirit of the three-strikes law. [¶] So, first of all, the defendant is not eligible for probation because [he] is being sentenced under the three-strikes law. And if the Court were to strike the priors, the Court would be required to sentence the defendant for Count 1 under the one-strike law."

Under section 1385, subdivision (a), a sentencing court may, " 'in furtherance of justice,' " dismiss a finding that a defendant has a prior strike. (*People v. Carmony* (2004) 33 Cal.4th 367, 373 (*Carmony*); *Romero*, *supra*, 13 Cal.4th at pp. 529–530.) In evaluating a defendant's request to strike a prior strike, a court " 'must consider whether, in light of the nature and circumstances of [the defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of [the defendant's] background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part.' " (*Carmony*, at p. 377.)

The Three Strikes law, which is " 'intended to restrict courts' discretion in sentencing repeat offenders' . . . [¶] . . . [¶] . . . creates a strong

---

few of the cases cannot be reconciled on this basis, but each in part depends upon the particular responses of the juror, and it does not appear that any sound purpose would be served by discussing the cases individually"].)

[9] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

26

presumption that any sentence that conforms to [its] sentencing norms is both rational and proper." (*Carmony, supra,* 33 Cal.4th at pp. 377–378.) Thus, "a trial court will only abuse its discretion in failing to strike a prior felony conviction . . . in limited circumstances," such as where it "considered impermissible factors in declining to dismiss" the conviction or where " 'the sentencing norms [of the Three Strikes law] . . . produce[] an "arbitrary, capricious[,] or patently absurd" result' under the specific facts of a particular case." (*Id.* at p. 378.)

We review the denial of a *Romero* motion for an abuse of discretion. (*Carmony, supra,* 33 Cal.4th at p. 374.) " ' "[T]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' " (*Id.* at pp. 376–377.)

Defendant claims his case is "an exceptional one in which refusal to disregard a prior strike in the interest[s] of justice amounts to abuse of discretion." He points to the following: (1) That the length his sentence, 50 years to life, is "tantamount to life without [the] possibility of parole for a man in his mid-30s." (2) He was not a habitual criminal, having "had only one prior conviction," which was a "categorically different offense (attempted armed robbery)," he had not committed any other offense in the 13 years preceding this incident. (3) His offenses "in this case were the result of intense jealously, triggered when he discovered [the victim], the woman he loved, who was the mother of his young daughter, appeared to be . . . involved with another man." (4) The victim "acknowledged that he was a caring father." (5) He showed "genuine remorse."

Even assuming this list suggests sentencing courts could differ on whether to strike defendant's prior, it does not establish that the trial court imposed an " ' "arbitrary, capricious[,] or patently absurd" ' " sentence. (*Carmony*, *supra*, 33 Cal.4th at p. 378.)  A " ' "decision will not be reversed merely because reasonable people might disagree.  'An appellate tribunal is neither authorized nor warranted in substituting its judgment for the judgment of the trial judge.' " ' " (*Id.* at p. 377.)  There is a strong presumption the court's imposition of the Three Strikes sentence is both rational and proper unless the court was not "aware of its discretion" to dismiss (*People v. Langevin* (1984) 155 Cal.App.3d 520, 524) or the court considered impermissible factors in declining to strike the prior.  (*People v. Gillispie* (1997) 60 Cal.App.4th 429, 434.)  Neither exception applies here.

## DISPOSITION

The judgment is AFFIRMED.

_____
Banke, Acting P.J.

We concur:


_____
Margulies, J.*


_____
Getty, J.**


* Retired Justice of the Court of Appeal, First Appellate District assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**Judge of the Solano County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A162458, People v. Teague